UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ERNEST FENNELL, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-cv-128-JJM-AEM |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
|     Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Ernest Fennell brings a medical malpractice action against the United States ("the Government") under the Federal Tort Claims Act ("FTCA"). ECF No. 1. He alleges that medical staff at a federally qualified health center acted negligently in prescribing him medication to treat his bipolar disorder and failed to properly notify him of the risks associated with taking that medication. *Id.* The Government now moves for summary judgment on Mr. Fennell's lack of informed consent claim (Count 2), arguing that Mr. Fennell cannot prove a necessary element of that claim. ECF No. 24.

For the reasons that follow, the Court DENIES the Government's Motion for Summary Judgment.

## I.    BACKGROUND[1]

### A.    Mr. Fennell's Initial Medical Care and Treatment

In 2003, while he was a junior in high school, Mr. Fennell was diagnosed with bipolar disorder.  It was around this time, during a week-long hospitalization, that Mr. Fennell was first prescribed medication to treat his bipolar disorder.[2]

In or around 2006 or 2007, Mr. Fennell was hospitalized once more after he began to have suicidal thoughts.  During this second hospitalization, Mr. Fennell was prescribed Seroquel.[3]  Mr. Fennell thereafter took Seroquel until 2009 at which point he discontinued use of the medication.

Several years later, in November 2018, Mr. Fennell sought treatment for depression with the Comprehensive Community Action Program ("CCAP"), a federally qualified health center in Cranston, Rhode Island.  During this visit, Mr. Fennell reported to medical staff that he had a history of bipolar disorder, that he had previously been prescribed Seroquel, and that he wished to restart that

---

[1] Unless otherwise noted, the following facts are undisputed and come directly from the parties' statements of undisputed/disputed facts and other briefing.  *See* ECF No. 25; ECF No. 52-1; ECF No. 52.  As the non-moving party, the Court views any undisputed facts in the light most favorable to Mr. Fennell.  *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 92 (1st Cir. 2021).

[2] The parties dispute the precise medication that was prescribed to Mr. Fennell during his 2003 hospital visit.  The Government contends that, "[d]uring that 2003 hospitalization, he was prescribed . . . Seroquel for the first time."  ECF No. 25 at 4.  Mr. Fennell disputes this, asserting that he was prescribed a different medication called Trileptal, and that he was not prescribed and did not begin taking Seroquel until his second hospitalization in 2006 or 2007.  ECF No. 52-1 at 8.

[3] Seroquel is a second-generation antipsychotic medication used to treat bipolar disorder.  It is also referred to as quetiapine.

medication.    Mr. Fennell was prescribed Seroquel, along with some other medications, which he filled that same day at CVS Pharmacy.

On November 29, 2018, Mr. Fennell voluntarily admitted himself to Butler Hospital.  At a physical examination, he reported "worsening depressive symptoms with suicidal ideation, visual hallucinations, and intermittent general paranoia." Medical staff increased his Seroquel dosage and discontinued some of the other medications he was taking.  Mr. Fennell's symptoms began to improve, and he was discharged from the hospital a few days later with instructions to follow up with CCAP for outpatient treatment.

Mr. Fennell's next visit to CCAP came on December 14, 2018, when he underwent a Psychiatric Diagnostic Evaluation with Cynthia Jankowski, a nurse practitioner at CCAP.  As part of her evaluation, Ms. Jankowski noted that Mr. Fennell denied suicidal ideation but had reported "intermitted command AH [audio hallucination] to hurt others."  Ms. Jankowski thereafter increased Mr. Fennell's Seroquel dosage, and Mr. Fennell continued to fill this prescription at CVS.

On January 24, 2019, Mr. Fennell met with Cindy Johnson, an advanced practice registered nurse ("APRN") at CCAP, for the first time.  During that appointment, Mr. Fennell expressed concerns with his weight, and he reported having an increased appetite while on Seroquel.  Ms. Johnson opted to discontinue

3

Mr. Fennell's use of Seroquel and instead prescribed him Geodon.[4] Mr. Fennell filled his Geodon prescription that same day.

Mr. Fennell returned to the CCAP office for a second appointment with Ms. Johnson on March 20, 2019. At this appointment, Mr. Fennell reported that his mood felt more stable, but that he continued to have trouble sleeping. Ms. Johnson thereafter opted to increase Mr. Fennell's Geodon dosage.

At a third appointment on April 7, 2020, Mr. Fennell disclosed to Ms. Johnson that he had started taking some of his leftover Seroquel medication at the same time that he was taking Geodon. It was at this point that Mr. Fennell asked that he be prescribed Seroquel again. Ms. Johnson obliged and wrote him prescriptions for both medications, which Mr. Fennell filled for the next year or so.

On August 19, 2021, Mr. Fennell came in for another appointment and reported to Ms. Johnson that he had stopped taking his medications about three to four weeks prior. He told her that he had been experiencing involuntary movements of his neck and jaw with accompanying shortness of breath. Ms. Johnson explained to Mr. Fennell that tardive dyskinesia[5] can occur when medications are stopped and

---

[4] Geodon, which is also referred to as ziprasidone, is another second-generation antipsychotic medication used to treat bipolar disorder. The parties do not dispute that, as compared to other antipsychotic medication (including Seroquel), Geodon has a lower risk of weight gain. ECF No. 25 at 6; ECF No. 52-1 at 9.

[5] Tardive dyskinesia is an involuntary-movement disorder that can be caused by antipsychotic medication. Common symptoms of tardive dyskinesia include, but are not limited to, involuntary movements of the lips, tongue, and jaw. ECF No. 25 at 2; ECF No. 52-1 at 3.

suggested that his symptoms may be reduced if he restarted his medications. As such, Ms. Johnson restarted Mr. Fennell on Geodon.

Mr. Fennell followed up with Ms. Johnson two weeks later. His symptoms had failed to dissipate, and Ms. Johnson noted that Mr. Fennell's involuntary movements were "severe." Ms. Johnson made the decision to wean Mr. Fennell off Geodon, and he filled his last Geodon prescription on September 2, 2021. Mr. Fennell continued to fill his CCAP prescription for Seroquel from at least September 17, 2021 through November 13, 2022.

Around this time, Mr. Fennell sought treatment from specialists for his tardive dyskinesia. He was prescribed Austedo[6] to reduce the intensity of his symptoms, which he took along with his Seroquel medication. Though the Austedo medication helped to minimize the intensity of his involuntary movements, Mr. Fennell reports that his tardive dyskinesia is likely permanent.

### B.     Mr. Fennell Files a Claim Against the Government

On September 28, 2022, Mr. Fennell filed an administrative claim against CCAP with the U.S. Department of Health and Human Services ("HHS"),[7] accusing the federal entity of medical malpractice. Given the conflict of interest created by his claim, CCAP terminated its patient relationship with Mr. Fennell. As part of its

---

[6] Austedo is a VMAT2 inhibitor used to treat tardive dyskinesia.

[7] Because Mr. Fennell brings suit under the FTCA, federal law required him to first present his claim to the appropriate federal agency (i.e., HHS) and wait until that agency denied his claim before he could bring a claim in federal court. *See* 28 U.S.C. §§ 2401(b), 2675; *see also Barrett ex rel. Estate of Barrett v. United States*, 462 F.3d 28, 36 (1st Cir. 2006).

discharge planning, CCAP prescribed Mr. Fennell three months' worth of Seroquel to be used until he could find a new provider.

On February 23, 2023, HHS sent Mr. Fennell a letter, informing him that his claim had been denied. That same day, Mr. Fennell started seeing a new medical care provider at Tri-County Community Action Agency ("TCCAA"). His TCCAA provider also prescribed him Seroquel beginning on April 26, 2023 through at least December 13, 2024. At Mr. Fennell's request, these dosages of Seroquel were twice increased after he expressed concerns that he was seeing and hearing things.

Mr. Fennell filed this suit, alleging that the medical staff at CCAP who prescribed him Geodon failed to properly notify him of the risks associated with taking that medication.[8]  ECF No. 1. The Government now moves for summary judgment on Mr. Fennell's lack of informed consent claim. ECF No. 24.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." *Perez v. Lorraine Enters., Inc.*, 769 F.3d 23, 29 (1st Cir. 2014). "A 'material'

---

[8] Mr. Fennell also brings claims of negligence, corporate liability, and vicarious liability. ECF No. 1 at 3-8. These claims are not at issue in this motion.

fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." *Id.*

To prevail, the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (quoting *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)). Once the moving party has made such a showing, "the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour v. Dynamics Rsch. Corp.*, 63 F.3d 32, 37 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 256.

In analyzing a motion for summary judgment, a court "examine[s] the record in the light most favorable to the nonmovant and draw[s] all reasonable inferences in that party's favor." *López-Hernández v. Terumo P.R. LLC*, 64 F.4th 22, 28 (1st Cir. 2023). However, the court "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility P.R., Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)).

7

## III.   DISCUSSION

As mentioned, Mr. Fennell has brought a lack of informed consent claim against the Government under the FTCA.  ECF No. 1.  Federal courts generally "lack jurisdiction over claims against the United States unless the government has waived its sovereign immunity." *Sanchez v. United States*, 740 F.3d 47, 50 (1st Cir. 2014) (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994)).  The FTCA provides "a limited congressional waiver" of that immunity and gives courts jurisdiction over civil claims against "the United States for tortious acts and omissions committed by federal employees acting within the scope of their employment."   *Díaz-Nieves v. United States*, 858 F.3d 678, 683 (1st Cir. 2017); *see also Sanchez*, 740 F.3d at 50.

The "law of the place" where the alleged act or omission occurred governs actions brought under the FTCA.  *Calderón-Ortega v. United States*, 753 F.3d 250, 252 (1st Cir. 2014) (citing 28 U.S.C. § 1346(b)(1)).  Here, then, the Court will look to and apply Rhode Island tort law.

Under Rhode Island law, the doctrine of informed consent "imposes a duty upon a doctor which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills." *Wilkinson v. Vesey*, 295 A.2d 676, 687 (R.I. 1972).  A doctor also has a duty to inform their patient of "the risk involved and the alternatives to [a proposed course of] treatment." *Id.*  Indeed, "informed consent is not possible when a physician has failed to address both the material risks associated with and the viable alternatives to a recommended [treatment]." *Flanagan v. Wesselhoeft*, 712 A.2d 365, 370 (R.I. 1998) (internal citations omitted).

8

A plaintiff seeking to recover under this doctrine "must also prove that if he or she had been informed of the material risks and alternative methods of treatment, he or she would not have consented to the [treatment]." *Kenny v. Wepman*, 753 A.2d 924, 926 (R.I. 2000) (citing *Wilkinson*, 295 A.2d at 628-29).

Thus, there are two basic elements that Mr. Fennell must prove to prevail on his lack of informed consent claim: (1) that his medical provider failed to communicate the material risks[9] associated with and the viable alternatives to a recommended treatment; and (2) that he would not have consented to such treatment had he been informed of the material risks and alternative methods of treatment.[10] *See Kenny*, 753 A.2d at 926; *Flanagan*, 712 A.2d at 371.

Here, Mr. Fennell alleges that CCAP, through its employee Cindy Johnson, failed to inform him of the risks associated with the prescribed use of Geodon, including the risk of developing tardive dyskinesia. ECF No. 1 at 2-6; ECF No. 52

---

[9] "[I]n the context of informed consent in a medical malpractice case, the question of materiality depends on the significance that a reasonable patient would attach to the disclosed risk when deciding whether to submit to treatment." *State v. Breen*, 767 A.2d 50, 58 (R.I. 2001) (citing *Lauro v. Knowles*, 739 A.2d 1183, 1186 (R.I. 1999) (per curiam)).

[10] This appears to be a "particular patient" subjective standard. *See generally* Beth Holliday, *Cause of Action Against Physician for Failure to Obtain Patient's Informed Consent*, 49 Causes of Action 2d 573, § 23 (Mar. 2026 update). That is, the plaintiff must show that adequate disclosure would have caused the patient at issue to decline the treatment. *Compare Kenny*, 753 A.2d at 926, *with Gorney v. Meaney*, 150 P.3d 799, 804 (Ariz. Ct. App. 2007) (holding that a necessary element of lack of informed consent claim is that "adequate disclosure would have caused the plaintiff to decline the treatment") *and Bowman v. Beghin*, 713 N.E.2d 913, 917 (Ind. Ct. App. 1999) ("In the context of informed consent, there must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made, consent to treatment would not have been given.").

at 11, 13.  Had he known of the risks associated with taking Geodon, Mr. Fennell claims that "he would have refused to consent to the performance of said treatment and care."  ECF No. 1 at 5; *see also* ECF No. 52 at 10-13.

In its motion, the Government attacks the second element of Mr. Fennell's claim by seizing on a fact that neither party disputes, which is that all antipsychotic medications, including Geodon and Seroquel, pose some risk for tardive dyskinesia. *See* ECF No. 25 at 1-2; ECF No. 52-1 at 1-2.  This is fatal to Mr. Fennell's claim, so says the Government, because his continued use of Seroquel through December 2024—more than two years after he first filed his administrative claim with HHS— undermines his contention that he never would have consented to the risk that Geodon poses for tardive dyskinesia.  ECF No. 24 at 15-16; ECF No. 53 at 1-2.  Put another way, the Government argues that Mr. Fennell has "consented to and assumed the risks that all [these antipsychotic medications] present" because he has taken Seroquel with the full knowledge that it too poses a risk of tardive dyskinesia. ECF No. 53 at 1.

The Government seems to be raising an assumption of the risk defense, which typically accompanies negligence actions.  This is not out of place in this lack of informed consent case, however, given that Rhode Island courts have long recognized that this type of claim "sounds in negligence."  *Wilkinson*, 295 A.2d at 686; *see also Medeiros v. Yashar*, 588 A.2d 1038, 1044 (R.I. 1991) (Weisberger, J., concurring) ("The question of informed consent bears upon the issues of due care and negligence."); *DiCristoforo v. Fertility Sols., P.C.*, 521 F. Supp. 3d 153, 157 (D.R.I.

2021) ("Elements of a lack of informed consent claim mirror those of a negligence claim."). Indeed, in his Complaint, Mr. Fennell brings a separate negligence claim— which is not at issue in the present motion—that alleges many of the same facts as his lack of informed consent claim. *Compare* ECF No. 1 at 3-4, *with id.* at 4-6.

Under Rhode Island law, "'the doctrine of assumption of the risk is an affirmative defense that, if proven, absolves a defendant of liability for having created an unreasonable risk.'" *Walker v. Jackson*, 723 A.2d 1115, 1117 (R.I. 1999) (per curiam) (cleaned up) (quoting *Rickey v. Boden*, 421 A.2d 539, 543 (R.I. 1980)). The defense is typically available in run-of-the-mill negligence cases, such as products liability claims, *see Mignone v. Fieldcrest Mills*, 556 A.2d 35, 41 (R.I. 1989), and premises liability claims, *see Walker*, 723 A.2d at 1117. In the medical context, however, "[i]t is axiomatic that absent express indication to the contrary, a patient receiving medical care does not assume the risk of general negligence." *Picotte v. Calenda*, No. C.A. PC99–6142, 2006 WL 2243019, at *5 (R.I. Super. Ct. Aug. 2, 2006) (citing *Owens v. Silvia*, 838 A.2d 881, 903 (R.I. 2003); *Hennessey v. Pyne*, 694 A.2d 691, 700 (R.I. 1997); *Ferguson v. Marshall Contractors*, 644 A.2d 310, 310 (R.I. 1994)).

Where, as here, there is an absence of an express agreement between the parties, "a defendant must prove that a plaintiff 'knew of the existence of a danger, appreciated its unreasonable character, and then voluntarily exposed himself to it.'" *Labrie v. Pace Membership Warehouse, Inc.*, 678 A.2d 867, 872 (R.I. 1996) (quoting *Drew v. Wall*, 495 A.2d 229, 231 (R.I. 1985)). This "is a 'subjective standard, keyed solely on the observations and understandings of the plaintiff at the time of

11

injury.'" *D'Allesandro v. Tarro*, 842 A.2d 1063, 1067 (R.I. 2004) (quoting *Habib v. Empire Prods., Inc.*, 739 A.2d 662, 664 (R.I. 1999) (per curiam)).

"Whether a plaintiff has assumed the risk of harm is generally a question for a trier of fact." *D'Allesandro*, 842 A.2d at 1067 (citing *Rickey*, 421 A.2d at 543). "However, if such a unique occasion arises in which the facts can suggest only one reasonable inference, the trial justice must treat the issue as one of law." *Iadevaia v. Aetna Bridge Co.*, 389 A.2d 1246, 1249 (R.I. 1978) (citing *Kennedy v. Providence Hockey Club, Inc.*, 376 A.2d 329 (R.I. 1977); *Garris v. Gloss*, 303 A.2d 765 (R.I. 1973)). In this circumstance, the defense must show that only one reasonable inference can be drawn from the record: namely, "that the plaintiff actually knew about the risk involved and appreciated its magnitude." *Id.* at 1249-50.

The Government contends that this issue can be decided in its favor "[a]s a matter of law." ECF No. 24 at 15. However, in viewing the record in the light most favorable to Mr. Fennell, as this Court must do at the summary-judgment stage, it would appear that more than one reasonable inference can be drawn from the record. First, there is no dispute between the parties that Mr. Fennell did not know of the risk that Geodon posed for tardive dyskinesia at the time that medication was first prescribed to him back in 2019. Whether this moment marked the time of Mr. Fennell's injury is a question that is yet to be decided. *See D'Allesandro*, 842 A.2d at 1067 (holding that whether a plaintiff assumed the risk of harm is a subjective standard to be decided "solely on the observations and understandings of the plaintiff *at the time of injury*" (emphasis added)); *Habib*, 739 A.2d at 664 (same).

12

Second, it does not follow that, just because Mr. Fennell knew of the risks associated with taking Seroquel, that he also implicitly knew of the risks involved with taking Geodon or, perhaps more importantly, that he appreciated the magnitude of those risks. *Iadevaia*, 389 A.2d at 1249-50. Though the parties do not dispute that both Geodon and Seroquel pose *some* risk for tardive dyskinesia, there is a genuine dispute between the parties over whether Geodon poses a *higher* risk for tardive dyskinesia than Seroquel.[11] *See* ECF No. 52 at 5-6, 14; ECF No. 52-1 at 1-5.

This issue is a material one because the magnitude of the risk may differ between the two medications. By way of analogy, consider the difference between a car and a motorcycle. Both vehicles come with some risk whenever they are taken out on the road, as accidents can occur for all sorts of reasons. However, a motorcycle undoubtedly poses a much higher risk. Without the structural frame, airbags, and seatbelts of a car, even a minor collision on a motorcycle can lead to far more serious injuries. As relevant here, Mr. Fennell may have been willing to take on some risk

---

[11] The parties each rely on expert testimony that points in opposite directions on this issue. Mr. Fennell relies on the testimony of Dr. Dan Kiel, a licensed pharmacist and an Associate Professor of Pharmacology at Massachusetts College of Pharmacy and Health Sciences. ECF No. 24 at 4 n.4; ECF No. 52 at 6. The Government relies on the testimony of Dr. Deepak Cyril D'Souza, a board-certified psychiatrist and the Vikram Sodhi Endowed Chair of Psychiatry at Yale University. ECF No. 24 at 5 n.6.

Ultimately, the credibility of witnesses and the weight to give to their testimony is a determination to be made by the trier of fact. *Sheehan v. N. Am. Mktg. Corp.*, 610 F.3d 144, 149 (1st Cir. 2010). It is not appropriate to evaluate these considerations at the summary-judgment stage. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014) (citing *Sheehan*, 610 F.3d at 149).

13

in order to treat his bipolar disorder, but that does not necessarily mean that he consented to taking on a high degree of risk.

These considerations certainly cast doubt on the notion that only one reasonable inference can be drawn from the record. Whether Mr. Fennell assumed the risks that all antipsychotic medications pose such that he cannot establish his lack of informed consent claim therefore cannot be decided as a matter of law. Rather, this is a question that must be decided by the trier of fact. *D'Allesandro*, 842 A.2d at 1067; *Rickey*, 421 A.2d at 543.

It would therefore be inappropriate to grant summary judgment on this basis alone, and the Government's motion must be denied. *See Martins v. Omega Elec. Co.*, 692 A.2d 1203, 1206 (R.I. 1997) (reversing grant of summary judgment for defendant because "the record . . . suggest[ed] that more than one reasonable inference" could be drawn from plaintiff's conduct and "that, therefore, [plaintiff's] subjective apprehension of danger was a question to be decided by the trier of fact and not by the motion justice as a matter of law"); *see also D'Allesandro*, 842 A.2d at 1068 (affirming trial court's entry of summary judgment for defendant after "hearing justice made a valiant attempt to discern a reasonable inference other than assumption of the risk" but could not ultimately do so).

## IV.    CONCLUSION

For the reasons stated, the Court DENIES the Government's Motion for Summary Judgment on Mr. Fennell's lack of informed consent claim. ECF No. 24.

IT IS SO ORDERED.


*s/John J. McConnell, Jr.*

_____
JOHN J. MCCONNELL, JR.,
Chief Judge
United States District Court


April 6, 2024